**Electronically Filed
Intermediate Court of Appeals
CAAP-15-0000439
20-OCT-2016
08:51 AM**

NO. CAAP-15-0000439

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee, v.
LAWRENCE L. BRUCE, Defendant-Appellant, and
JUSTIN MCKINLEY, Defendant-Appellee


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CRIMINAL NO. 14-1-0987)


MEMORANDUM OPINION
(By: Foley, Presiding J. and Leonard, J.
with Ginoza, J. concurring and dissenting separately)

Defendant-Appellant Lawrence L. Bruce (**Bruce**) appeals
from the "Judgment of Conviction and Sentence" entered on May 5,
2015 in the Circuit Court of the First Circuit[1] (**circuit court**).

On appeal, Bruce contends:

(1) the evidence at trial was insufficient to support
his conviction for promoting prostitution in the second degree;

(2) the circuit court abused its discretion when it
allowed Detective Derek Stigerts (**Stigerts**) of the Sacramento
Police Department to testify as an expert on the commercial
sexual exploitation of women;

(3) Plaintiff-Appellee State of Hawai'i (**State**)
committed prosecutorial misconduct during its closing arguments
that violated Bruce's constitutional right to a fair trial; and

---

[1]     The Honorable Paul B.K. Wong signed the May 5, 2015 "Judgment of
Conviction and Sentence."  The Honorable Randal K.O. Lee presided over the
proceedings.

(4) the circuit court abused its discretion by allowing a potential witness to assert her Fifth Amendment privilege against self-incrimination.

## I. BACKGROUND

On June 17, 2014, the grand jury indicted Bruce on one count of promoting prostitution in the first degree in violation of Hawaii Revised Statutes (**HRS**) § 712-1202(1)(a) (2014 Repl.) and one count of sexual assault in the first degree in violation of HRS § 707-730(1)(a) (2014 Repl.). The charge of promoting prostitution in the first degree,[2] which was related to the crime that Bruce was ultimately convicted of following trial, stated:

> COUNT 1: On or between April 1, 2014 to and including April 19, 2014, in the City and County of Honolulu, State of Hawai'i, [Bruce] did knowingly advance prostitution by compelling or inducing [the Complaining Witness (**CW**)] by force, threat, fraud, or intimidation to engage in prostitution, and/or did knowingly profit from such conduct by another, thereby committing the offense of Promoting Prostitution in the First Degree, in violation of [HRS § 712-1202 (1)(a)].

On December 24, 2014, the State filed a motion in limine to introduce expert testimony by Stigerts "in the area of sex trafficking, sexual exploitation of women and the dynamics of the pimp-prostitute relationship."

---

[2] HRS § 712-1202 provides:

**§712-1202 Promoting prostitution in the first degree.** (1) A person commits the offense of promoting prostitution in the first degree if the person knowingly:

    (a) Advances prostitution by compelling or inducing a person by force, threat, fraud, or intimidation to engage in prostitution, or profits from such conduct by another; or

    (b) Advances or profits from prostitution of a person less than eighteen years old.

    (2) Promoting prostitution in the first degree is a class A felony.

    (3) As used in this section:

"Fraud" means making material false statements, misstatements, or omissions.

"Threat" means any of the actions listed in section 707-764(1).

On January 5, 2015, the circuit court held a hearing on the various motions in limine filed, including the State's motion in limine to introduce testimony. At the close of the hearing, the circuit court stated:

> Well, based on the hearing that we just had concluded, the Court under Rule 702 of the Hawaii Rules of Evidence [(HRE)] will allow [Stigerts] to testify as an expert. The Court finds that based on his experience and training and his prior qualification as to commercial sexual exploitation of not only children but adults, he does possess knowledge in regards to the field of prostitution that is not possessed by the average trier of fact, and it is based on his training and experience.
>
> The Court further finds that it is relevant because the time period in which [CW] allegedly was associated in this case was from April 1st of 2014 through May 13, 2014, so it would explain -- his testimony would assist the jurors to understand the circumstances and explain why perhaps the [CW] remained in the situation that she was in. So I will allow [Stigerts] to testify as an expert.

Between January 12 and January 23, 2015, the circuit court held a jury trial for Bruce and co-defendant Justin McKinley (**McKinley**).[3] Stigerts was the first witness the State called to testify. Stigerts testified about his experience investigating commercial sexual exploitation cases as a police detective with the Sacramento Police Department's vice unit and the Federal Bureau of Investigation's Child Exploitation Task Force. The State moved to qualify Stigerts as an expert in the "area of commercial sexual exploitation of women and children[.]" McKinley objected and Bruce joined in the objection. The circuit court sustained the objection on the basis that the State needed to better clarify Stigerts' qualifications to testify as an expert in the commercial sexual exploitation of women.

The State then continued its examination of Stigerts, who testified more specifically about his experience investigating adult prostitution cases and the "crossover" between adult and child prostitute cases. The State again moved to qualify Stigerts as an expert in the area of commercial sexual exploitation of women. McKinley objected on the basis of lack of

---

[3]    McKinley was charged with one count of promoting prostitution in the first degree, two counts of sexual assault in the first degree, and one count of kidnapping.

foundation and Bruce once again joined in the objection. Over the objections of McKinley and Bruce, the circuit court qualified Stigerts as an expert in the area of "commercial sexual exploitation of women." Stigerts then testified to what he referred to as the "pimp-prostitute subculture," which is the lifestyle associated with illegal prostitution activities. According to Stigerts, the "pimp-prostitute subculture" involves "everything from the participants, which are the pimps, prostitutes, the customers, which are called tricks or johns, and law enforcement who actually investigates [sic] these crimes."

After Stigerts testified, the State called CW to testify against Bruce. CW made an in-court identification of Bruce as the man that she knew as "L-Way" and testified that she knew his first name was "Lawrence" but did not know his last name. CW testified that she began prostituting as Bruce's "girl" shortly after she arrived in Hawai'i in the hopes of making enough money to return home to Alaska. She knew where to find Bruce after a man she knew as "Lando," who CW identified as a pimp she worked for in San Diego,[4] told her where Bruce's hostel was located in Waikiki.

After meeting Bruce at his hostel, CW discussed the details of her prostituting for him. Shortly thereafter, CW became Bruce's "girl" by having sexual intercourse with him. As his "girl," she also "work[ed] for him," which meant that she went on dates[5] with clients and gave the money she received from the dates to Bruce without receiving a portion for herself. While prostituting in San Diego, CW had an advertisement posted to a website called "Backpage," which she described as a "website where girls post their ads, their pictures, as prostitutes to make money." On or about April 1, 2014, Bruce used his tablet

---

[4] CW testified that "Lando" paid for her trip to Hawai'i and made the travel arrangements for her, but did not force her to go. CW testified that after she arrived in Hawai'i she lost contact with "Lando" and no longer sent him any money. When asked by Bruce's counsel whether "Lando" was the "real L-Way," CW responded that "Lando" did not go by that name.

[5] The term "date" appears to refer to a scheduled encounter between a prostitute and client where the prostitute performs sexual acts for the client in exchange for money.

computer to repost the text of CW's San Diego Backpage advertisement to the Hawaiʻi location and used his "Vanilla card"[6] to pay the five-dollar fee to have her advertisement be "number one on the list." Bruce set the price for CW's dates and determined what types of acts she was to perform for clients. Bruce took possession of her identification card and social security card so that she "wouldn't be able to go nowhere."

CW testified that initially she lived with Bruce at a hostel in Waikiki and that Bruce rented two rooms, one for sleeping and the other for dates (**Date Room**). CW testified that on one occasion a client came to the Date Room to engage in sexual conduct with CW. After the date was over and the client left, Bruce entered the Date Room and CW gave Bruce the money that she received from the client. When asked by the State why she gave the money to Bruce, CW responded that she was afraid of the consequences that she may receive from Bruce, including a fear that she would "get beat" by him, if she kept the money or did "something wrong." She testified that she was not okay with engaging in prostitution because she "was selling [her] body for money" and that felt like she was Bruce's "property."

CW testified that on or around April 11, 2014, she and Bruce relocated to the Best Western Hotel by the Honolulu Airport after Bruce received a tip from McKinley that they could make more money prostituting in that location. CW and Bruce met with McKinley, who Bruce introduced to CW as "another pimp," and another woman, Keshawn Stewart (**Stewart**), at the Best Western Hotel. Bruce updated CW's Backpage advertisement to reflect her new location. Soon after arriving at the Best Western Hotel, CW and Stewart "[got] ready for dates, [got] dressed up, [did] our hair and makeup, and wait[ed] for calls." CW had her first date from that location on the second day.

On April 13, 2014, CW and Stewart were arrested for prostitution after setting up a date with an undercover police officer. CW did not want to go on the date because "the guy

---

[6]     CW testified that the "Vanilla card" is "like a Visa card that you can put money on."

sounded funny, like he was a cop." At the time CW received the call for the date, Bruce was sitting next to her and expressed that he wanted her to go. CW decided to go with Stewart on the date in order "[t]o make money." CW was arrested and Bruce's "baby mama," Jennie Ortegon (**Ortegon**), posted bail for CW. CW returned to the Best Western Hotel with Bruce and McKinley.

CW testified that she did not want to continue prostituting after her arrest because she felt prostituting "wasn't for [her]." She expressed her feelings to Bruce, and he responded by telling her that he would help her to get home and would be there for her. However, after CW's arrest, Bruce had left the Best Western Hotel for about two days and had likely gone back to the hostel in Waikiki. As a result of his absence, McKinley called Bruce to tell him that CW was to become his property since Bruce left her behind.

CW testified that on April 19, 2014 Bruce returned to the Best Western Hotel to retrieve his belongings and gave CW's identification card and social security card to McKinley. CW also testified that on April 19, 2014 she went on a date in response to a call set up on McKinley's phone, instead of the phone that she used when she worked for Bruce, which symbolized her switch from being Bruce's "girl" to being McKinley's "girl." During cross-examination by Bruce's counsel, CW testified that she chose to stop working for Bruce and to begin working for McKinley because she was not making enough money to get home by working for Bruce.

The State then called its expert in the field of digital forensic examination of mobile devices and several Honolulu Police Department police officers who were involved in the case to testify. The State entered into evidence various text messages that were sent to and from a T-Mobile cellphone that was found on Bruce's person during his arrest (**T-Mobile cellphone**).

After the State rested, Bruce moved to dismiss and for a judgment of acquittal on his charges of promoting prostitution in the first degree and sexual assault in the first degree. The

circuit court granted the judgment of acquittal on both charges based on insufficient evidence, but found that there still remained sufficient evidence to proceed on a charge for promoting prostitution in the second degree.[7]

When testimony resumed, Stewart testified as McKinley's sole witness and identified McKinley as her boyfriend. Stewart testified that Bruce had not lived at the Best Western Hotel with her and McKinley and that she met Bruce for the first time during trial.

After McKinley's defense rested, Bruce's counsel attempted to call Ortegon to testify on behalf of Bruce. Ortegon, however, asserted her privilege against self-incrimination and refused to testify. The circuit court did not compel Ortegon to testify.

Bruce then testified on his own behalf. Bruce testified that he had not told CW that his name was "L-Way" and that there was no reason why anyone would call him "L-Way." He testified that the only nicknames he went by was "Larry" or "Bruce Bruce." Bruce believed the true "L-Way" was CW's former boyfriend from San Diego who also went by the nickname "Lando." Text messages that Bruce claimed were sent and received between Ortegon and the "real L-Way" while Ortegon was in possession of Bruce's T-Mobile cellphone, proved that he was not "L-Way."

Bruce denied ever managing CW as a prostitute, acting as her pimp, setting prices for her prostitution activities, or maintaining her Backpage advertisement. Bruce testified that CW

---

[7] On January 26, 2015, the circuit court entered a Judgment of Acquittal that acquitted Bruce of promoting prostitution in the first degree and sexual assault in the first degree and added promoting prostitution in the second degree as a charged offense.

HRS § 712-1203 (2014 Repl.) establishes the offense of promoting prostitution in the second degree and provides:

§712-1203 Promoting prostitution in the second degree. (1) A person commits the offense of promoting prostitution in the second degree if the person knowingly advances or profits from prostitution.

(2) Promoting prostitution in the second degree is a class B felony.

had never stayed with him at the hostel and denied using the hostel to facilitate CW's dates with clients. He claimed that he did not know that CW, Stewart, and his girlfriend Ortegon all engaged in prostitution and claimed to have never "made money off of any girl by way of prostitution[,]" including CW. Bruce also denied ever having sexual intercourse with CW, although he testified that at one point he believed CW was flirting with him, and denied having ever gone to the Best Western Hotel. Moreover, Bruce claimed that CW never told him that she was trying to go back home to San Diego or Alaska.

The defense rested, and the State presented its closing arguments repeatedly characterizing the case as a "sex trafficking" case without objection from Bruce or McKinley. The State also stated:

> So this whole thing about her lying and can't be believed, well, the only people who can't be believed was [Stewart] and [Bruce]. The fact of the matter is that they treated her like she was property. And the odd thing about it is that it's as if this all happened, like, back in the 1700's, 1800's, where we owned people, where people were owned and disrespected and made to do things that they didn't want to do.

> But this crime happened in 2014, 2014, and we, as a society, have evolved, you would think, but not to these two gentlemen here. They didn't see her as anything more than a piece of property to pass around, to mistreat, to humiliate, intimidate, beat, and force. That is how they viewed her, that is how they treated her. But she's not a piece of property. I mean, she's somebody's daughter, she's somebody's friend, she's a mother, she's a woman, she is a person, and she deserves to be treated properly[.]

McKinley objected on the basis that the State's statements were "a little bit far beyond arguing the evidence," but Bruce did not join. The circuit court overruled the objection.

On January 26, 2015, the jury returned a verdict finding Bruce guilty of promoting prostitution in the second degree. The circuit court entered its Judgment of Conviction and Sentence on May 5, 2015, sentencing Bruce to ten years of incarceration.

On June 2, 2015, Bruce filed his notice of appeal.

## II.   STANDARD OF REVIEW

### A.   Sufficiency of Evidence

Appellate courts in Hawai'i review the sufficiency of evidence during a criminal trial as follows:

> Evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

State v. Kalaola, 124 Hawai'i 43, 49, 237 P.3d 1109, 1115 (2010) (brackets omitted) (quoting State v. Richie, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998)). "'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Kalaola, 124 Hawai'i at 49, 237 P.3d at 1115 (quoting Richie, 88 Hawai'i at 33, 960 P.2d at 1241).

**B. Expert Testimony**

> Whether expert testimony should be admitted at trial rests within the sound discretion of the trial court and will not be overturned unless there is a clear abuse of discretion. An abuse of discretion occurs when the decisionmaker exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.

State v. Fukagawa, 100 Hawai'i 498, 503, 60 P.3d 899, 904 (2002) (citations and internal quotation marks omitted).

**C. Prosecutorial Misconduct**

"Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999) (citation and internal quotation marks omitted) (quoting State v. Sawyer, 88 Hawai'i 325, 329 n.6, 966 P.2d 637, 641 n.6 (1998)).

**D. Privilege Against Self-Incrimination**

"Whether a trial court should compel a witness to testify over the witness's assertion that his answer might tend to incriminate him or her is a matter within the sound exercise

of its discretion, and is thus reviewed for an abuse of discretion." State v. Kupihea, 80 Hawai'i 307, 312, 909 P.2d 1122, 1127 (1996) (internal citation omitted). "The circuit court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." Id. (quoting Kaneohe Bay Cruises, Inc. v. Hirata, 75 Haw. 250, 251, 861 P.2d 1, 3 (1993)).

### III. DISCUSSION

### A. Sufficiency of Evidence

Bruce argues on appeal that the evidence introduced at trial was insufficient to support his conviction for promoting prostitution in the second degree because the State failed to present substantial evidence that he was "L-Way" -- the person that CW testified was her pimp in Hawai'i. Bruce argues that CW was not a credible witness and, therefore, this court should disregard her testimony when reviewing the sufficiency of the State's evidence against him.

"[A]n appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." State v. Pomroy, 132 Hawai'i 85, 95, 319 P.3d 1093, 1103 (2014). This is the general rule to which appellate courts adhere and a rule that Bruce acknowledges in his opening brief. Nevertheless, citing State v. Taylor, 130 Hawaii 196, 307 P.3d 1142 (2013), Bruce urges this court to abandon the general rule and reassess the credibility of CW's testimony on appeal.

In Taylor, the Hawai'i Supreme Court addressed whether the circuit court committed plain error when it failed to give a sua sponte jury instruction on the mistake of fact defense. Taylor, 130 Hawai'i at 208, 307 P.3d at 1154. The supreme court held that it was ultimately the circuit court's responsibility, as opposed to being the jury's responsibility, to determine whether the defendant presented credible evidence to warrant giving a mistake of fact instruction. The supreme court instructed:

10

> "[C]redible evidence" in this context means that the circuit court should have concluded, based on the record that existed at trial, that the evidence "offered reasonable grounds for being believed," i.e., that "a reasonable juror could harbor a reasonable doubt" as to the defendant's guilt, and should have given the unrequested mistake of fact jury instruction.

Id. at 207, 307 P.3d at 1153. The supreme court noted:

> We are aware that "credibility" is usually associated with subjective believability. See, e.g., State v. West, 95 Hawai'i 452, 464, 24 P.3d 648, 660 (2001) ("Appellate courts must objectively review all the evidence and avoid commenting on its subjective believability, especially the credibility of the witnesses.") Appellate courts are, however, sometimes required to employ credibility determinations. For example, "when an appellate court reviews the sufficiency of the evidence, it examines whether there was substantial evidence to support the conclusion of the trier of fact. . . . Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." State v. Gomes, 117 Hawai'i 218, 226, 177 P.3d 928, 936 (2008) (citation omitted). Thus, in the current context, we examine whether the defendant met her initial burden to adduce evidence with reasonable grounds for being believed.

Taylor, 130 Hawai'i at 205 n.10, 307 P.3d at 1151 n.10 (brackets omitted). Reviewing the evidence presented during trial, the supreme court determined that the defendant "had not met her initial burden of adducing credible evidence of facts constituting the [mistake of fact] defense, and those facts were not supplied by the prosecution's witnesses[,]" therefore, the circuit court did not commit plain error when it failed to give a mistake of fact instruction. Id. at 208, 307 P.3d at 1154 (footnote omitted).

Taylor is distinguishable from the facts of this appeal. In the case at hand, we are tasked with determining whether the State adduced sufficient evidence to support Bruce's conviction, which is distinguishable from the issue in Taylor (i.e., whether there was credible evidence to warrant giving a defense instruction). We decline to expand the holding in Taylor by applying its rulings to cases outside the context of defense instructions. In criminal cases decided after Taylor, the Hawai'i Supreme Court has reaffirmed the general rule that the appellate courts are not to disturb the trier of fact's credibility determinations on appeal when analyzing whether the

prosecution adduced sufficient evidence to support a defendant's conviction. See Pomroy, 132 Hawai'i at 95, 319 P.3d at 1103 (citing the general rule that the appellate courts are not to disturb a trier of fact's credibility determinations to hold that the prosecution provided substantial evidence to support the defendant's conviction); State v. Monteil, 134 Hawai'i 361, 368, 341 P.3d 567, 574 (2014) ("It is not the role of the appellate court to weigh credibility or resolve conflicting evidence."); see also State v. Guyton, 135 Hawai'i 372, 381, 351 P.3d 1138, 1147 (2015) (holding that the State failed to provide sufficient evidence to support the defendant's conviction even after according deference to the district court's credibility determinations). Therefore, we proceed with our review of the sufficiency of the evidence against Bruce with the understanding that "[t]he question of credibility and the weight to be given the evidence is for the trier of fact to determine and is not disturbed on appeal." Pomroy, 132 Hawai'i at 95, 319 P.3d at 1103 (quoting State v. Ewing, 81 Hawai'i 156, 165, 914 P.2d 549, 558 (App. 1996)).

Under HRS § 712-1203, "[a] person commits the offense of promoting prostitution in the second degree if the person knowingly advances or profits from prostitution." This definition incorporates the concept of "prostitution," which is a separate offense, under HRS § 712-1200 (2014 Repl.).[8] See Richie, 88 Hawai'i at 29, 960 P.2d at 1237 ("It is clear that the definition of promoting prostitution in the second degree incorporates the concept of 'prostitution.'").

CW testified that she knew Bruce as "L-Way" and that Bruce managed her advertisement page on Backpage to facilitate

---

[8]  HRS § 712-1200 provides in pertinent part:

§712-1200 Prostitution. (1) A person commits the offense of prostitution if the person:

(a)  Engages in, or agrees or offers to engage in, sexual conduct with another person for a fee; or

(b)  Pays, agrees to pay, or offers to pay a fee to engage in sexual conduct.

dates with clients looking for a prostitute. CW testified that Bruce instructed her to bring clients back to the hostel for dates and that Bruce set the price for sexual acts that she was to perform for paying clients. CW testified that, after every date, she gave the money from the client to Bruce without receiving any of the money for herself. CW also testified that she lived with Bruce at a hostel in Waikiki and that together they moved to the Best Western Hotel by the Honolulu Airport in the hopes of making more money from prostituting. Based on the record before us, the State presented sufficient evidence to support the jury's guilty verdict on the charge of promoting prostitution in the second degree. See Kalaola, 124 Hawai'i at 49, 237 P.3d at 1115.

**B. Stigerts' Testimony**

Bruce challenges the admission of Stigerts' expert testimony, arguing that (1) Stigerts did not qualify as an expert in the field of "adult pimp-prostitute relationships"; (2) Stigerts' testimony "did not assist the jury in comprehending or understanding something not commonly known or understood"; and (3) Stigerts' testimony improperly bolstered the credibility of CW.

HRE Rule 702 governs the admission of expert testimony at trial and provides:

> **Rule 702 Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

"Thus, a witness may qualify as an expert if he or she possesses a background in any one of the five areas contemplated by HRE Rule 702: knowledge, skill, experience, training, or education." Fukagawa, 100 Hawai'i at 511, 60 P.3d at 912.

The Hawai'i Supreme Court has identified three determinations that the trial court must make before admitting expert testimony into evidence:

> (1) the witness is in fact an expert; (2) the subject matter of the inquiry is of such a character that only persons of skill, education, or experience in it are capable of a correct judgment as to any facts connected therewith; and (3) the expert testimony will aid the trier of fact to understand the evidence or determine a fact in issue.

State v. Toyomura, 80 Hawai'i 8, 26 n.19, 904 P.2d 893, 911 n.19 (1995) (emphasis and brackets omitted) (citing Larsen v. State Sav. & Loan Ass'n, 64 Haw. 302, 304, 640 P.2d 286, 288 (1982)).

### 1. Expert witness qualifications

With respect to determining whether a witness is an expert in a particular field, the Hawai'i Supreme Court has maintained:

> It is not necessary that the expert witness have the highest possible qualifications to testify about a particular matter, but the expert witness must have such skill, knowledge, or experience in the field in question as to make it appear that his opinion or inference-drawing would probably aid the trier of fact in arriving at the truth. Once the basic requisite qualifications are established, the extent of an expert's knowledge of the subject matter goes to the weight rather than the admissibility of the testimony.

Fukagawa, 100 Hawai'i at 504, 60 P.3d at 905 (ellipses omitted) (quoting Toyomura, 80 Hawai'i at 26 n.19, 904 P.2d at 911 n.19).

Stigerts testified that he had a bachelor's of science degree in criminal justice from California State University, Sacramento; had been with the Sacramento Police Department in California since 1991; became a detective with the police department in 2005; and began investigating adult and child prostitution cases in 2006 through his work with the police department's vice unit and with the Federal Bureau of Investigation's Child Exploitation Task Force. Stigerts has been involved in "well over 150" cases involving commercial sexual exploitation, with approximately thirty-five of those cases involving solely adults and thirty cases involving both adults and children. Stigerts conducted "over 250" interviews with prostitutes, with "[w]ell over a hundred" interviews with prostitutes that were eighteen years old or older, constituting

14

adult prostitutes.[9] Stigerts also testified that, as a police detective, he took classes on the subject of commercial sexual exploitation of children, which he stated was relevant to adult prostitution cases because the classes taught about the general "pimp-prostitute subculture." According to Stigerts, the "pimp-prostitute subculture" describes the lifestyle of those involved in prostitution activities and involves "everything from the participants, which are the pimps, prostitutes, the customers, which are called tricks or johns, and law enforcement who actually investigates [sic] these crimes."

Bruce argues that, although Stigerts testified about the similarities between child and adult prostitution, "the fact that a special task force had been created for child prostitution and that training courses and seminars were given specifically in the area of child sexual exploitation/prostitution evidenced that the subject was distinct and specialized." We disagree.

Stigerts testified that the work of the vice unit and special task force worked collaboratively and that if he knew a particular pimp well, he would work a case even if it involved adult prostitutes. In addition to Stigerts' extensive testimony about his experience investigating adult and child prostitution cases separately, he testified to how the two types of prostitution were indistinguishable and that the classification of a "child" prostitute versus an "adult" prostitute was legal fiction that has no impact on the dynamics between a pimp and prostitute and the psychology of prostitution. Stigerts testified that there was considerable "crossover" between the sexual exploitation of women and children. When the State asked Stigerts, "Is there a separate subculture that involves only children as prostitutes, or are they intermixed with adults?", Stigerts responded:

_____

[9] In addition, Stigerts stated that when "an arrest is made of a pimp, slash, exploiter" one of the things the vice unit or task force does is "interview the subject." Stigerts testified that the vice unit and task force has had several post-conviction interviews with pimps who agreed to speak about the way the prostitution subculture operates. Stigerts indicated that he talked to pimps about how the subculture operates "at least 20 times."

It's all intermixed. It all works pretty much the same. There are a [sic] little differences when you're talking about children, especially the younger that [sic] they are. Again, when you're talking about adult commercial trafficking and [an] underaged [sic] juvenile, it's all the same, pretty much. Everything that I had found from talking to either the adult -- the adult girls or the underaged [sic] girls, whether it's the methods of recruitment, the methods of control, the manipulation, it's all pretty much the same whether it's a child or an adult. And, again, I mean, we talk about if it's 17 and 300 days old, that's a child in the legal definition, what we deal with. And, you know, six months later, that's an adult. But the things don't change on the way that she works as a prostitute.

Based on the supreme court's standard, Stigerts' testimony was sufficient to establish himself as an expert in the field of the commercial sexual exploitation of women. See Fukagawa, 100 Hawai'i at 504, 60 P.3d at 905; see also United States v. Brooks, 610 F.3d 1186, 1195-96 (9th Cir. 2010) (holding that a detective's eight years of experience as a police officer, two and a half years in the vice unit, twenty to twenty-five full scale child prostitution investigations, fifty interviews with pimps and prostitutes, undercover work, attendance in several specialized trainings in child prostitution and training in child prostitution qualified her as an "expert on the business of prostitution and the relationships between pimps and prostitutes"). Because the State established that Stigerts satisfied the requisite qualifications to testify as an expert, Bruce's challenges to the extent of Stigerts' knowledge of the subject area goes to the weight, rather than the admissibility, of his testimony. See Fukagawa, 100 Hawai'i at 504, 60 P.3d at 905. Therefore, the circuit court did not abuse its discretion by qualifying Stigerts as an expert in the area of commercial sexual exploitation of women.

### 2. Usefulness of expert testimony to jury

Bruce argues that the circuit court "did not specify the basis for its conclusion that the dynamics of the pimp-prostitute relationship was 'outside the ken of ordinary laity' and that it was necessary to present an expert on this topic." Bruce bases his contention in part on the fact that the public has access to some of the resources Stigerts references in his

line of work.[10]   Bruce's argument is without merit.

Expert testimony is meant to assist the trier of fact by providing "a resource for ascertaining truth in relevant areas outside the ken of ordinary laity." State v. Clark, 83 Hawai'i 289, 298, 926 P.2d 194, 203 (1996) (quoting State v. Batangan, 71 Haw. 552, 556, 799 P.2d 48, 51 (1990)).  The Hawai'i Supreme Court has previously held "[t]he common experience of a jury, in most cases, provides a sufficient basis for assessment of a witness' credibility[,]" thus making expert testimony on a witness' credibility inappropriate.  Batangan, 71 Haw. at 556, 799 P.2d at 51.  The supreme court recognized an exception, however, in cases of sexual abuse of children because child sexual abuse "is a particularly mysterious phenomenon and the common experience of the jury may represent a less than adequate foundation for assessing the credibility of a young child who complains of sexual abuse."  Id. at 557, 799 P.2d at 51 (citations and internal quotation marks omitted).  The supreme court maintained that "[c]hild victims of sexual abuse have exhibited some patterns of behavior which are seemingly inconsistent with behavioral norms of other victims of assault" and noted:

> While jurors may be capable of personalizing the emotions of victims of physical assault generally, and of assessing witness credibility accordingly, tensions unique to trauma experienced by a child sexually abused by a family member have remained largely unknown to the public. The routine indicia of witness credibility—consistency, willingness to aid the prosecution, straight forward rendition of the facts—may, for good reason be lacking. As a result jurors may impose standards of normalcy on child victim/witnesses who consistently respond in distinctly abnormal fashion.

Id. at 557, 799 P.2d at 51 (ellipsis and brackets omitted) (quoting State v. Moran, 728 P.2d 248, 251 (1986)).

This court has since applied the rationale in Batangan to uphold use of expert testimony to explain a possible reason for a complaining witness's recantation in cases involving abuse

---

[10]   During trial, Stigerts testified that he learned about the "pimp-prostitute subculture" from various resources that are available to the general public, including books, such as "Pimpology: The 48 Laws of the Game", and films, such as "Pimps Up, Ho's Down" and "American Pimp."

of a family member.  See State v. Cababag, 9 Haw. App. 496, 507, 850 P.2d 716, 722 (1993) (holding that the family court did not abuse its discretion in permitting the use of an expert witness to testify that "at the trial of an alleged male batterer of a woman with whom he is living, where the woman recants her pretrial accusations that she was battered by the male, one reasonable explanation for the recantation is the battered housemate/spouse syndrome").

Similarly, expert testimony is appropriate in cases involving the commercial sexual exploitation of women.  In the case at hand, Stigerts testified about the various ways pimps control the women that work for them and explained that women who prostitute may behave in counterintuitive ways.  Stigerts explained that the women engaged in prostitution often do not seek or accept help from law enforcement because they fear getting in trouble, as they are themselves engaged in illegal activities, do not have anyone to turn to for help, and continue prostituting because they have become isolated in an unfamiliar city or state.  Stigerts also explained that a woman who prostitutes often fears that if she seeks help from law enforcement, her pimp or those associated with her pimp may see her as a "snitch" and seek retribution against her or her family. Stigerts testified that even when women begin prostituting voluntarily, "force, fraud, or coercion comes into . . . play" at some point.

Like cases of child sexual assault and abuse of household members as explained in Batangan, the common experience of the jury represents a less than adequate foundation for assessing the credibility of a witness who either currently is or previously was a part of the "pimp-prostitute subculture."  See Batangan, 71 Hawai'i at 557, 799 P.2d at 51.  Other jurisdictions have recognized that "the relationship between prostitutes and pimps is not the subject of common knowledge" and it was appropriate for an expert to provide insight into such relationships to aid the jury's assessment of witnesses' credibility.  See Brooks, 610 F.3d at 1196 (quoting United States

18

v. Taylor, 239 F.3d 994, 998 (9th Cir. 2001)). Given the nature of commercial sexual exploitation of women and the lack of common knowledge about the power dynamic between pimps and prostitutes, the circuit court did not err in allowing Stigerts to testify as an expert witness.

### 3. Bolstering the credibility of CW

Bruce argues that Stigerts' testimony impermissibly bolstered the credibility of CW. Specifically, Bruce argues that "[b]y informing the jurors of what Stigerts believed were the typical behaviors of pimps and prostitutes, he implicitly vouched for [CW's] credibility in every instance where her claimed behavior or her claims as to the actions of Bruce was consistent with Stigerts' testimony."

In Batangan, the Hawai'i Supreme Court recognized that expert testimony on any subject "carries the potential of bolstering the credibility of one witness and conversely refuting the credibility of another[,]" but maintained that "[s]uch testimony, by itself, does not render the evidence inadmissible." Batangan, 71 Haw. at 558, 799 P.2d at 52. Instead, "[t]he pertinent consideration is whether the expert testimony will assist the jury without unduly prejudicing the defendant." Id. The supreme court held:

> [W]hile expert testimony explaining 'seemingly bizarre' behavior of child sex abuse victims is helpful to the jury and should be admitted, conclusory opinions that abuse did occur and that the child victim's report of abuse is truthful and believable is of no assistance to the jury, and therefore, should not be admitted.

Id.

Furthermore, as this court noted in State v. Mars, 116 Hawai'i 125, 170 P.3d 861 (App. 2007), in the context of a child sex abuse case:

> [T]here is absolutely nothing wrong with expert opinion testimony that bolster's [sic] the credibility of the indicted allegations of sexual abuse, e.g., the victim's physical examination showed injury consistent with sexual abuse, or the victim's psychological evaluation was consistent with sexual abuse. Establishing the credibility of the indicted acts of sexual abuse is what the State's case is all about and is the purpose for such expert testimony in the first place; the fact that such testimony may also indirectly, though necessarily, involve the child's credibility does not render it inadmissible.

19

> What is forbidden is expert opinion testimony that <u>"directly addresses the credibility of the victim,"</u> i.e., "I believe the victim; I think the victim is telling the truth," <u>or expert opinion testimony that implicitly goes to the ultimate issue to be decided by the jury, when such issue is not beyond the "ken" of the average juror</u>, i.e., "In my opinion, the victim was sexually abused." Although the distinction may seem fine to a layman, there is a world of legal difference between expert testimony that "in my opinion, the victim's psychological exam was consistent with sexual abuse," and expert testimony that "in my opinion, the victim was sexually abused." In the first situation, the expert leaves the ultimate issue/conclusion for the jury to decide; in the second, the weight of the expert is put behind a factual conclusion which invades the province of the jury by providing a direct answer to the ultimate issue: was the victim sexually abused?

Id. at 140, 170 P.3d at 876 (emphases added) (quoting Odom v. State, 531 S.E.2d 207 (Ga. Ct. App. 2000)).

Here, unlike in Batangan, Stigerts' testimony did not usurp the function of the jury or exceed the scope of permissible expert testimony. During Bruce's trial, Stigerts did not testify to the believability of CW nor did he testify about Bruce's culpability. Stigerts testimony was based on his own expertise and experiences, and his testimony provided general background information about the nature of "pimp-prostitute subculture," thus leaving the ultimate conclusions for the jury to determine. Stigerts' testimony was admitted to help the jury assess the credibility of CW and was not unduly prejudicial against Bruce; therefore, Stigerts' testimony was permissible.

## C. Prosecutorial Misconduct

Bruce argues that his conviction should be reversed because the State committed misconduct during [its] closing argument by "using the inflammatory and prejudicial term 'sex trafficking,' by comparing the incident to slavery[,] and by making impermissible appeals to the jurors' emotions."

> With regard to the prosecution's closing argument, a prosecutor is "permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence."

Rogan, 91 Hawai'i at 412, 984 P.2d at 1238 (quoting State v. Quitog, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)).

"[Appellate courts] evaluate[] claims of improper

20

statements by prosecutors by first determining whether the statements are improper, and then determining whether the misconduct is harmless." State v. Tuua, 125 Hawai'i 10, 14, 250 P.3d 273, 277 (2011); see State v. Schnabel, 127 Hawai'i 432, 452-53, 279 P.3d 1237, 1257-58 (2012) (determining whether the prosecutor's statements amounted to misconduct before determining whether the misconduct was harmless). Appellate courts consider the following factors when determining whether a prosecutor's statements are harmless: "(1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant." Rogan, 91 Hawai'i at 412, 984 P.2d at 1238 (quoting Sawyer, 88 Hawai'i at 329 n.6, 966 P.2d at 641 n.6 (1998)). If the State's prosecutorial misconduct was not harmless, appellate courts must then determine whether the double jeopardy clause of the Hawai'i Constitution bars reprosecution of the defendant. Rogan, 91 Hawai'i at 416, 984 P.2d at 1242.

### 1. Characterizing case as a "sex trafficking" case

Bruce argues that by characterizing the case as a "sex trafficking" case, the State misstated the law and misled the jury into believing that Bruce was involved in acts beyond the promoting prostitution in the second degree charge. Bruce argues that the term "'[s]ex trafficking' is an overly-broad term that includes prostitution, but includes other acts that were not at issue in this case."

During closing arguments, the State remarked:

> So essentially what this case is about, this case is about sex trafficking. Sex trafficking is alive and well in Hawaii. Many of you probably haven't heard much of it, but this case was really an opportunity to hear about a very different part of the community, which is the pimp prostitution or the pimp prostitute world.
>
> Aside from what we already know about prostitution -- I think most people would think about streetwalkers or they think about escort services, maybe even massage parlors. I mean, that is the general concept that I think most people have when we talk about prostitution, but this case really is so much more than that. It is far more than just what we see, what we may have common knowledge of, because it gave us a glimpse into the world of prostitution and really what happens behind the scenes with the people that are involved in it -- the pimps, the prostitutes, and the people that they associate with.

> Really, when we talk about sex trafficking, we're talking about forced prostitution. I think what we all heard from the expert was generally that it can come in two forms, yeah. With an adult, it involves forced prostitution, and it also can involve prostitution of persons under the age of 18, which is not our case at all, so really what we're talking about is forced prostitution in this case.
>
> . . . .
>
> So sex trafficking is, generally speaking, it is codified in our penal code under very specific sections. It is called advancing prostitution or promoting prostitution, and you read all the instructions that the judge gave you, but I'm just going to go through these really quickly.

(Emphases added.)

The State then continued on to describe the legal elements of promoting prostitution in the first degree and second degree,[11] while characterizing the offenses as "form[s] of sex trafficking":

> Promoting Prostitution in the First Degree. A person commits the offense of Promoting Prostitution in the First Degree if he knowingly advances by compelling or inducing a person by force, threat, fraud, or intimidation, to engage in prostitution; or it can be profits from the advancement of prostitution by another who compels or induces another by force, fraud, intimidation, to engage in prostitution.
>
> Promoting Prostitution in the Second Degree, another form of sex trafficking, a person commits the offense of Second Degree Promoting Prostitution if he knowingly advances or profits from prostitution.
>
> Now, here, it's really important for you to realize that the difference between Promoting I and Promoting II is the coersive [sic] element. Promoting I requires force, fraud, threat, or intimidation. Promoting Prostitution in the Second Degree does not require that, so you should not consider that if you're looking at Promoting Prostitution in the Second Degree, and that is specifically to [Bruce]. So that is a really important distinction to make between the two offenses.
>
> Advancing prostitution, the definition is out there. Really, ultimately, what you need to know is that a person causes or aids a person to commit or engage in prostitution. All you have to do is cause or aid. You can go through the rest of the definition, but causing or aiding someone to engage in prostitution. Doesn't require being a manager or having somebody employed. It really is just aiding them or causing them to engage in prostitution.
>
> Profits from prostitution, essentially, you just

---

[11] We note that although the circuit court acquitted Bruce of the promoting prostitution in the first degree charge, the jury remained tasked with determining whether McKinley was guilty of the offense.

profit from the proceeds of prostitution. That's what the definition is. That's what you should go through.

So these are very important, but the distinction really is in Promoting I and Promoting II and the coercive element in it.

Because Bruce did not object to the State's repeated use of the term "sex trafficking" at trial, we review the alleged errors for plain error. See State v. Wakisaka, 102 Hawai'i 504, 513, 78 P.3d 317, 326 (2003) ("If defense counsel does not object at trial to prosecutorial misconduct, this court may nevertheless recognize such misconduct if plainly erroneous."); Hawai'i Rules of Penal Procedure Rule 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). "[Appellate courts] may recognize plain error when the error committed affects substantial rights of the defendant." Id. (quoting State v. Cordeiro, 99 Hawai'i 390, 405, 56 P.3d 692, 707 (2002)). Misstatements of the law during closing arguments may constitute prosecutorial misconduct if the misstatements are prejudicial to the defendant. See State v. Espiritu, 117 Hawai'i 127, 142-44, 176 P.3d 885, 900-02 (2008).

We must first determine whether the State's use of the term "sex trafficking" was improper. See Schnabel, 127 Hawai'i at 452, 279 P.3d at 1257 (determining whether a prosecutor's closing argument constituted misconduct as the first step in a prosecutorial misconduct analysis). In its answering brief, the State argues that the term "sex trafficking" is interchangeable with the applicable offense of promoting prostitution because, based on its plain meaning, the definition for "sex trafficking" and the legal definition of promoting prostitution have similar meanings. The term "sex trafficking" is a term of art with differing legal definitions based on one's jurisdiction. Compare N.Y. Penal Law § 230.34 (McKinney 2007) (listing a number of acts that constitute "sex trafficking," including intentionally advancing or profiting from prostitution by "unlawfully providing to a person who is patronized, with intent to impair said person's judgment . . . a narcotic drug or a narcotic

23

preparation") with Minn. Stat. § 609.321 (2011) (defining "sex trafficking" as "(1) receiving, recruiting, enticing, harboring, providing, or obtaining by any means an individual to aid in the prostitution of the individual; or (2) receiving profit or anything of value, knowing or having reason to know it is derived from an act described in clause (1)"); see also G.A. Res. 55/25, annex II, "Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime" (Jan. 8, 2001) ("'Trafficking in persons' shall mean the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation."). Black's law dictionary defines "sex trafficking" as "[t]he act or practice of recruiting, harboring, transporting, providing, or procuring a person, or inducing a person by fraud, force, or coercion, to perform a sex act for pay." Black's Law Dictionary 1584 (10th ed. 2014).

During the time of Bruce's trial, "sex trafficking" was not an offense under the Hawaii Revised Statutes and Hawai'i courts had not defined the term. Nevertheless, Hawai'i statutory law and case law contained generalized references to the term "sex trafficking" or "human trafficking" in the context of promoting prostitution offenses. See State v. Vaimili, 135 Hawai'i 492, 494, 353 P.3d 1034, 1036 (2015) (describing the case as arising from the defendant's "convictions for sex trafficking related crimes based on his conduct as a pimp for the complaining witness" where the defendant was charged with kidnapping, terroristic threatening in the first degree, promoting prostitution in the first degree, and carrying or use of a firearm in the commission of a separate felony); see also HRS § 706-650.5(3) (2014 Repl.) (establishing a "human trafficking victim services fund" to provide services to "victims of

trafficking related to crimes under part I of chapter 712[,]" which is a chapter entitled "Prostitution and Promoting Prostitution" during Bruce's trial).[12] During its closing arguments, the State used the term "sex trafficking" with similar generalized meaning.

Given that Hawai'i had not assigned a specific legal meaning to the term "sex trafficking" at the time of Bruce's trial and that common use indicates that the term is generally related to promoting prostitution, we decline to hold that the State's use of the term was improper and, thus, did not constitute prosecutorial misconduct. See State v. Kiakona, 110 Hawai'i 450, 458, 134 P.3d 616, 624 (App. 2006) (holding that because the prosecutor's comments were not improper, there was no prosecutorial misconduct).

### 2. Comments about a time "where people were owned"

Bruce argues that the State committed prosecutorial misconduct when it stated:

> The fact of the matter is that they treated [CW] like she was property. And the odd thing about it is that it's as if this all happened, like, back in the 1700's, 1800's, where we owned people, where [sic] people were owned and disrespected and made to do things that they didn't want to do.
>
> But this crime happened in 2014, 2014, and we, as a society, have evolved, you would think, but not to these two gentlemen here.[13]

Bruce argues that the State's comments were "an obvious reference to the slavery that occurred in America during the 18th and 19th centuries." Furthermore, Bruce argues that, "[a]s slavery is an

---

[12] We note that Hawai'i's promoting prostitution statues have been amended and renamed since the completion of Bruce's trial. On July 5, 2016, the Governor of the State Hawai'i signed into law Act 206, which changed the title of HRS § 712-1202 from "promoting prostitution in the first degree" to "sex trafficking," while maintaining substantially the same elements of the crime. H.B. 1902, H.D. 2, S.D. 1, C.D. 1, 28th Leg., Reg. Sess. (2016). In addition, Act 206 changed the name of HRS § 712-1203 from "promoting prostitution in the second degree" to "promoting prostitution," while maintaining the same elements of the offense. H.B. 1902, H.D. 2, S.D. 1, C.D. 1, 28th Leg., Reg. Sess. (2016).

[13] The circuit court subsequently struck the State's references to "the 1700 and the ownership of property" on January 26, 2015 and instructed the jury that they "must disregard entirely any matter which the Court has ordered stricken." [JTr doc 82 at 3]

extremely distasteful, inflammatory and prejudicial topic, the [State's] simile of the alleged acts by Bruce to slavery was a wholly improper appeal to the jurors' emotions and prejudices."

"[C]losing argument affords the prosecution (as well as the defense) the opportunity to persuade the jury that its theory of the case is valid, based upon the evidence adduced and all reasonable inferences that can be drawn therefrom." Rogan, 91 Hawai'i at 413, 984 P.2d at 1239 (citing Quitog, 85 Hawai'i at 145, 938 P.2d at 576). During closing arguments, the State argued that Bruce advanced CW's prostitution activities by "telling her what to do, what to charge, where to go if she caught a date[.]" The State's theory of the case was that Bruce and McKinley were "passing [CW] around like a piece of property," which was a characterization that CW introduced, and that "[t]hey were trying to make money off of her, and she wasn't doing her job."

The State's comments may have alluded to the practice of slavery, but they did not improperly highlight irrelevant racial differences. Cf. State v. Shabazz, 98 Hawai'i 358, 379-82, 48 P.3d 605, 626-29 (App. 2002) (holding that the prosecutor committed prosecutorial misconduct when it repeatedly referred to the complaining witness as a "young local woman" and the defendants as "six African-American males" where race was not a relevant factor). The State's comments also did not appeal to the racial prejudices of the jury. Cf. Rogan, 91 Hawai'i at 412-15, 984 P.2d at 1238-41 (holding that the State's description of the defendant as a "'black, military guy' was an improper emotional appeal that could have reasonably inflamed the jury"). The Ninth Circuit Court of Appeal has acknowledged the similarities between some systems of prostitution and slavery. See Coyote Pub., Inc. v. Miller, 598 F.3d 592, 600 (9th Cir. 2010) ("The federal government acknowledges the link between prostitution and trafficking in women and children, a form of modern day slavery."). Likewise, the State's remark was meant to highlight the similarities between slavery and prostitution so to further the State's theory of the case that CW was treated like a

"piece of property." The State's suggestion that Bruce and McKinley's treatment of CW was akin to a form of modern day slavery was not improper and, therefore, did not constitute prosecutorial misconduct. See Kiakona, 110 Hawai'i at 458-59, 134 P.3d 616, 624-25.

3. **Referring to CW as "somebody's daughter, . . . somebody's friend, . . . a mother, . . . a woman"**

Bruce also argues that the State committed prosecutorial misconduct when it stated:

> But this crime happened in 2014, 2014, and we, as a society, have evolved, you would think, but not to these two gentlemen here. They didn't see her as anything more than a piece of property to pass around, to mistreat, to humiliate, intimidate, beat, and force. That is how they viewed her, that is how they treated her. But she's not a piece of property. I mean, she's somebody's daughter, she's somebody's friend, she's a mother, she's a woman, she is a person, and she deserves to be treated properly --

(Emphasis added.) Citing to Rogan, Bruce argues that the State's comment impermissibly "induced the jurors to render a verdict based on their sympathy or emotions[,]" instead of the evidence and the law.

i. **Propriety of the State's remarks**

We hold that based on the Hawai'i Supreme Court's analysis in Rogan, the State's remarks, when viewed in context, were improper and, thus, constituted prosecutorial misconduct. In Rogan, the defendant, Rogan, was charged with three counts of sexual assault in the first degree and five counts of sexual assault in the third degree. Rogan, 91 Hawai'i at 409, 984 P.2d at 1235. The twelve-year-old complaining witness testified that she invited Rogan, who was twenty-two years old on the day in question, to her family home while her mother and stepfather were away. Id. She alleged that Rogan subjected to her to various acts of sexual contact and penetration until the complaining witness's mother came home and interrupted Rogan. Id. at 409-10, 984 P.2d at 1235-36. Rogan's testimony paralleled the complaining witness's, except that he denied any sexual contact or penetration took place. Id. at 409, 984 P.2d at 1235. During closing arguments, the prosecutor told the jury during its

rebuttal:

> There was one thing [that defense counsel mentioned] about, you know, it was the parents who wanted the conviction and somehow [the complaining witness] was coached. Yeah, you can bet the parents wanted a conviction. <u>This is every mother's nightmare. Leave your daughter for an hour and a half, and you walk back in, and here's some black, military guy on top of your daughter</u>.

<u>Id.</u> at 412, 984 P.2d at 1238 (emphasis added). Rogan moved for a mistrial based on prosecutorial misconduct, which the circuit court denied. <u>Id.</u> at 411, 984 P.2d at 1237. Rogan was convicted of four counts of unlawful sexual contact, either as charged or as lesser included offenses. <u>Id.</u>

> On appeal, the Hawai'i Supreme Court noted:

> Arguments that rely on racial, religious, ethnic, political, economic, or other prejudices of the jurors introduce into the trial elements of irrelevance and irrationality that cannot be tolerated. Of course, the mere mention of the status of the accused as shown by the record may not be improper if it has a legitimate bearing on some issue in the case, such as identification by race. But where the jury's predisposition against some particular segment of society is exploited to stigmatize the accused or the accused witnesses, such argument clearly trespasses the bounds of reasonable inference of fair comment on the evidence. Accordingly, many courts have denounced such appeals to prejudice as inconsistent with the requirement that the defendant be judged solely on the evidence.

<u>Rogan</u>, 91 Hawai'i at 413, 984 P.2d at 1239 (emphasis omitted) (quoting the 1979 Commentary, ABA Prosecution Function Standard 3-5.8(c) (3d ed. 1993)). The supreme court held that "Rogan's race was not a legitimate area of inquiry inasmuch as race was irrelevant to the determination of whether Rogan committed the acts charged" and, therefore, "the deputy prosecutor's reference to Rogan as a 'black, military guy' was an improper emotional appeal that could foreseeably have inflamed the jury." <u>Rogan</u>, 91 Hawai'i at 414, 984 P.2d at 1240. The supreme court also addressed the prosecutor's characterization of Rogan's alleged conduct as "every mother's nightmare":

> The deputy prosecutor's inflammatory reference to Rogan's race was further compounded by the statement that the incident was "every mother's nightmare," which was a blatantly improper plea to evoke sympathy for the Complainant's mother and represented an implied invitation to the jury to put themselves in her position. Like the deputy prosecutor's reference to Rogan's race, the "every mother's nightmare" comment was not relevant for purposes of considering whether Rogan committed the acts charged.

28

Id.

Like the remarks at issue in Rogan, the State's reference to CW as "somebody's daughter, . . . somebody's friend, . . . a mother, . . . a woman" was not a legitimate area of comment and constituted an improper plea to emotion. See id. The impropriety of the State's remarks and irrelevance of CW's status as a daughter, friend, mother, and woman is evident when viewed within the context of the State's rebuttal arguments and theory of the case. Cf. Schnabel, 127 Hawai'i at 452, 279 P.3d at 1257 (considering the context of the prosecutor's use of the term "mumbo jumbo" in reference to the court's jury instructions to determine that the prosecutor committed prosecutorial misconduct during closing arguments); State v. Meyer, 99 Hawai'i 168, 170-72, 53 P.3d 307, 309-11 (App. 2002) (holding that the prosecutor's reference to a law school professor during closing arguments, which the defendant argued exploited the prosecutor's personal knowledge, was "trivial and insignificant in the context of this case").

The State's theory of the case was that Bruce and McKinley were using CW to make money for their personal gain and that they saw CW as nothing "more than a piece of property to pass around, to mistreat, to humiliate, intimidate, beat, and force." To counter Bruce and McKinley's purported view of CW, the State remarked, "But she is not a piece of property. I mean [CW is] somebody's daughter, she's somebody's friend, she's a mother, she's a woman, she is a person, and she deserves to be treated properly[.]"

CW's status as a daughter, friend, mother, and woman, while perhaps supported by the evidence, was not a disputed fact at trial and was not relevant to whether Bruce or McKinley did in fact view or treat CW as a "piece of property." See Rogan, 91 Hawai'i at 413, 984 P.2d at 1239 ("[T]he mere mention of the status of the accused as shown by the record may not be improper if it has a legitimate bearing on some issue in the case, such as identification by race." (quoting the 1979 Commentary, ABA Prosecution Function Standard 3-5.8(c) (3d ed. 1993))); cf.

29

NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

Shabazz, 98 Hawai'i at 377, 48 P.3d at 624 (holding that "the reference to the race of the Defendants, and to Complainant's 'local' origin as a code word for race, had . . . no legitimate bearing on some issue in the case, such as identification by race." (citation and internal quotation marks omitted)); but cf. Kiakona, 110 Hawai'i at 458-59, 134 P.3d at 624-25 (holding that a prosecutor's references to "turf," "locals," and "haole tourists" during closing remarks were relevant to the defendant's motive and, therefore, did not constitute prosecutorial misconduct).  Thus, the State's comments about CW's relationship to others did not bolster the validity of the State's theory of the case.  See Rogan, 91 Hawai'i at 413, 984 P.2d at 1239.

Instead, the State's comments about CW's status as "somebody's daughter, . . . somebody's friend, . . . a mother, . . . a woman" were meant to humanize CW in the eyes of the jury evoking sympathy for her.  Like the prosecutor's "every mother's nightmare" comment in Rogan, the State's comments about CW's status represented an implied invitation for the jury to place themselves in CW's position, or in the position of someone near to her, enticing the jury to render a decision based on emotional appeal rather than on the evidence that proved Bruce's guilt.  See Rogan, 91 Hawai'i at 414, 984 P.2d at 1240; see also Ditto v. McCurdy, 86 Hawai'i 93, 127, 947 P.2d 961, 995 (App. 1997) (noting that arguments urging jurors "to place themselves or members of their families or friend in the place of a person who has been offended and to render the verdict as if they or either of them or a member of their families were similarly situated" are considered improper (brackets and internal quotation marks omitted)), rev'd in part on other grounds, 86 Hawai'i 84, 947 P.2d 952 (1997).  Because the State's remarks invited the jury to render a verdict based on emotional appeal and facts irrelevant to whether Bruce was guilty or innocent of the offense charged, the State's comments were improper and constituted prosecutorial misconduct.  Cf. State v. Pacheco, 96 Hawai'i 83, 95-97, 26 P.3d 572, 584-86 (2001) (holding that the prosecutor's characterization of the defendant as an "asshole"

constituted prosecutorial misconduct because it was irrelevant to his guilt and "could only have been calculated to inflame the passions of the jurors and to divert them, by injecting an issue wholly unrelated to [the defendant's] guilt or innocence into their deliberations, from their duty to decide the case of the evidence.").

### ii. Harmless error analysis

Because we concluded that the State's comments were improper so to constitute prosecutorial misconduct, we next evaluate whether the improper remarks were harmless based on the three Rogan factors: "(1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant." Rogan, 91 Hawai'i at 412, 984 P.2d at 1238 (quoting Sawyer, 88 Hawai'i at 329 n.6, 966 P.2d at 641 n.6).

The first factor in our harmless error analysis, the "nature of the conduct," weighs in favor of Bruce. "Although this court has previously allowed the prosecution wide latitude when making closing remarks, a prosecutor's comments may not infringe on a defendant's constitutional rights[,]" Schnabel, 127 Hawai'i at 453, 279 P.3d at 1258 (brackets and ellipses omitted) (quoting State v. Mattson, 122 Hawai'i 312, 325, 226 P.3d 482, 495 (2010)), including the constitutionally guaranteed right to a fair trial by an impartial jury. See Rogan, 91 Hawai'i at 414, 984 P.2d at 1240 (holding that the deputy prosecutor's racial comments represented a "brazen attempt to subvert the criminal defendant's right to a trial by an impartial jury as guaranteed by both the sixth amendment of the United States Constitution[14] and article I, section 14 of the Hawai'i Constitution[15]").

---

[14]    The Sixth Amendment of the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed[.]"

[15]    Article I, section 14 of the Hawai'i Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the district wherein the crime shall have been committed[.]"

Here, the State made its improper remarks during its rebuttal arguments in what appears to be a last ditch emotional plea to the jury. The State's remarks did to not help to "persuade the jury that its theory of the case [was] valid" nor did the remarks rebut statements made in the defenses' closing arguments. See Rogan, 91 Hawai'i at 413-14, 984 P.2d at 1239-40 (considering whether the deputy prosecutor's comments were made in support of the State's theory of the case or in rebuttal to defense counsel's closing argument so to be relevant). Instead, the State's remarks were improper pleas to evoke sympathy for CW, or those near to her, based solely on her status as a daughter, friend, mother, and woman. The State's improper remarks attempted to subvert Bruce's right to trial by an impartial jury and, therefore, the "nature of the conduct" weighs in favor of Bruce. See Rogan, 91 Hawai'i at 414, 984 P.2d at 1240.

As to the second factor, "a prosecutor's improper remarks are generally considered cured by the court's instructions to the jury, because it is presumed that the jury abided by the court's admonition to disregard the statement." Rogan, 91 Hawai'i at 415, 984 P.2d at 1241 (quoting State v. McGriff, 76 Hawai'i 148, 160, 871 P.2d 782, 794 (1994)). Although an objection was made to the State's comments, the circuit court overruled the objection and did not give a curative instruction.[16] Therefore, this factor also weighs heavily in

---

[16] We note that McKinley objected to the State's remarks, but that Bruce did not join in McKinley's objection. Several jurisdictions have adopted the approach that the objection of one defendant's counsel sufficiently preserves the issue for a co-defendant's appeal, even where the co-defendant's counsel does not join in the objection during trial. See United States v. Garcia, 291 F.3d 127, 140 (2d Cir. 2002) ("We presume that the objection of a co-defendant is an objection for all defendants, and it is sufficient to preserve the issue for appeal."); United States v. Pardo, 636 F.2d 535, 541 (D.C. Cir. 1980) ("We recognize that in certain situations, it may be redundant and inefficient to require each defendant in a joint trial to stand up individually and make every objection to preserve each error for appeal."); United States v. Cassity, 631 F.2d 461, 466 (6th Cir. 1980) ("Under these circumstances, we hold the remaining appellants did not waive their fourth amendment objections by neglecting to perform the useless and purely formal act of joining [co-defendant] Cassity in moving to suppress."); United States v. Brown, 562 F.2d 1144, 1147 n.1 (9th Cir. 1977) ("[W]hen one codefendant objects and thereby brings the matter to the attention of the court, further objections by other defendants are unnecessary."); United States v. Lefkowitz, 284 F.2d 310, 313 n.1 (2d Cir. 1960) ("We do not regard
(continued...)

favor of Bruce. See Rogan, 91 Hawai'i at 415, 984 P.2d at 1241 (holding that "the second factor - the promptness of a curative instruction - weighs heavily in favor of [defendant] Rogan inasmuch as no curative instruction was given.").

The last factor that we must consider in determining whether the error was harmless is the strength/weakness of the evidence against Bruce. See id. at 415-16, 984 P.2d at 1241-42. Factors that appellate courts have considered when determining the strength of conviction is the number of witnesses who testified against the defendant and the forensic evidence supporting prosecution. See id. (citing State v. Ganal, 81 Hawai'i 358, 377, 917 P.2d 370, 389 (1996)) (holding that the evidence against the defendant was not overwhelming, considering that the prosecution's case hinged on the credibility of the complaining witness). In order for an appellate court to find that the third factor weighs against a defendant, the evidence against the defendant must be "'so overwhelming as to outweigh the prejudicial effect of the improper comments,' such that the improper comments 'might not have contributed' to the defendant's conviction[.]" Schnabel, 127 Hawai'i at 456 n.49, 279 P.3d at 1261 n.49 (brackets omitted) (quoting Rogan, 91 Hawai'i at 415-16, 984 P.2d at 1241-42).

Here, the State failed to present overwhelming evidence against Bruce. The State's case against Bruce rested on CW's testimony and various text messages purportedly made between Bruce, CW, and Ortegon. CW's testimony, however, directly conflicted with the testimonies of Stewart and Bruce. While CW testified that she had worked for Bruce as a prostitute and gave him the money she received from clients, Bruce denied receiving

---

[16](...continued)
the failure of [defendant's] counsel to except as barring [defendant] from seeking reversal for error in the charge; [co-defendant] exception called the matter to the judge's attention and further exception would have been fruitless."); People v. Bradford, 245 N.W.2d 137, 138 (Mich. Ct. App. 1976) ("[I]t is hardly necessary for one counsel to repeat the objection made by the other when sufficient objections are interposed to direct the trial judge's attention to the situation." (parentheses omitted) (quoting People v. Logie, 32 N.W.2d 458, 460 (Mich. 1948)). Similarly, we hold that, under the facts of this case, McKinley's objections to the State's remarks sufficiently preserved the issue for Bruce's appeal.

any money from CW and claimed that he did not even know CW was a prostitute. CW testified that Bruce maintained her Backpage advertisements that were used to solicit clients looking for a prostitute, but Bruce denied doing so. CW testified that she stayed with Bruce in a hostel in Waikiki and, on at least one occasion, a client came to the hostel to engage in sexual intercourse with CW pursuant to Bruce's instructions. Bruce, however, denied that CW stayed with him at the hostel and denied using the hostel to facilitate CW's dates with clients. CW testified that she went to the Best Western Hotel with Bruce to make more money and that they met with McKinley and Stewart at the hotel; while Stewart countered that she never saw Bruce at the Best Western Hotel and that she met Bruce for the first time during his trial. Therefore, the witness testimony does not overwhelmingly prove Bruce's guilt.

Furthermore, the State's forensic evidence does little to overwhelmingly tilt the scale in the State's favor. The circuit court entered into evidence various text messages dated April 18 and 19, 2014 that the State claimed were sent between CW and the unidentified T-Mobile cellphone that the State argued belonged to Bruce. The text messages suggest that Bruce encouraged CW to find dates and bring them back to the hostel. CW's testimony corroborated the State's position that the text messages were sent to her from Bruce and that Bruce would keep in contact with her through text messages. Bruce, however, denied sending the text messages to CW and testified that he was not always in possession of the T-Mobile cellphone, implying that, although the text messages were sent from his cellphone, someone other than himself could have sent the messages to CW.

In further support of Bruce's claim that the messages were not from him, Bruce introduced, and the circuit court entered, evidence of text messages from April 13 and 14, 2014 that were sent between the T-Mobile cellphone and another phone number that was listed in the T-Mobile cellphone's contacts as

belonging to "L-Way."[17] Bruce contended that the content of the text messages proved that his girlfriend, Ortegon, had possession of his cellphone during part of April 2014 and that she was cheating on him with the "real L-Way," who was also known as "Lando." Bruce claimed that the text messages were sent between Ortegon and the "real L-Way," that he had neither sent nor received any of the text messages between them, and that he did not own more than one cellphone during April 2014. The State offered no evidence to refute Bruce's claims that the cellphone was not always in his possession. Given the conflicting evidence, we cannot say that the State's evidence was "so overwhelming" as to outweigh the inflammatory effect of the State's comments during the rebuttal argument. See Rogan, 91 Hawai'i at 415, 984 P.2d at 1241.

Because the relevant factors weigh against the State and in favor of Bruce, we hold that the State's remarks could have contributed to Bruce's conviction and, therefore, were not harmless beyond a reasonable doubt. See Rogan, 91 Hawai'i at 412, 984 P.2d at 1238.

### iii. Double Jeopardy

Once an appellate court determines that the State's prosecutorial misconduct was not harmless, the court must determine whether the double jeopardy clause of the Hawai'i Constitution bars reprosecution of the defendant. Rogan, 91 Hawai'i at 416, 984 P.2d at 1242. In Rogan, the Hawai'i Supreme Court held:

> Accordingly, we hold, under the double jeopardy clause of article I, section 10 of the Hawai'i Constitution, that reprosecution of a defendant after a mistrial or reversal on appeal as a result of prosecutorial misconduct is barred where the prosecutorial misconduct is so egregious that, from an objective standpoint, it clearly denied a defendant his or her right to a fair trial. In other words, we hold that reprosecution is barred where, in the face of egregious prosecutorial misconduct, it cannot be said beyond a reasonable doubt that the defendant received a fair trial.

---

[17] The State also admitted other incriminating text messages sent between the T-Mobile cellphone and a phone number that was listed in the contacts as "L-Way." Bruce, however, continued to testify that he neither sent nor received the text messages in question because the T-Mobile cellphone was not in his possession at the time.

Id. at 423, 984 P.2d at 1249 (footnotes omitted).

The Rogan court noted and emphasized:

> [T]he standard adopted for purposes of determining whether double jeopardy principles bar a retrial caused by prosecutorial misconduct requires a much higher standard than that used to determine whether a defendant is entitled to a new trial as a result of prosecutorial misconduct. Double jeopardy principles will bar reprosecution that is caused by prosecutorial misconduct only where there is a highly prejudicial error affecting a defendant's right to a fair trial and will be applied only in exceptional circumstances such as the instant case. By contrast, prosecutorial misconduct will entitle the defendant to a new trial where there is a reasonable possibility that the error complained of might have contributed to the conviction (i.e., the error was not "harmless beyond a reasonable doubt").

Id. at 423 n.11, 984 P.2d at 1249 n.11 (citation and emphasis omitted). Here, the State's remarks were not harmless beyond a reasonable doubt, but they also did not constitute an "exceptional circumstance." Because the State's comments did not rise to the level of egregiousness necessary for double jeopardy to bar the reprosecution of Bruce, we vacate and remand his case for a new trial consistent with this opinion. Compare Shabazz, 98 Hawai'i at 383, 48 P.3d at 630 (holding that the prosecution's statements referring to the complaining witness as a "young local woman" and the defendants as "six African-American males" did not "r[i]se to that pinnacle of egregiousness that bars reprosecution"), with Rogan, 91 Hawai'i at 424, 984 P.2d at 1250 (holding that the prosecution's statement that "it was 'every mother's nightmare' to find 'some black, military guy on top of your daughter'" was so egregious that double jeopardy barred reprosecution of Rogan).

## D. Privilege Against Self-Incrimination

Bruce argues that the circuit court "abused its discretion in failing to compel Ortegon to testify over her assertion of her Fifth Amendment privilege." Article I, section 10 of the Hawai'i Constitution, which is nearly identical to the Fifth Amendment of the United States Constitution,[18] provides in

---

[18] The Fifth Amendment of the United States Constitution provides, in pertinent part, "No person . . . shall be compelled in any criminal case to be
(continued...)

pertinent part that "[n]o person shall . . . be compelled in any criminal case to be a witness against oneself." This privilege against self-incrimination "is not limited to an accused testifying at his or her own criminal trial, but applies to testimony of any witness at any proceeding, where the testimony might tend to show that the witness had committed a crime." Kupihea, 80 Hawai'i at 313, 909 P.2d at 1128. "Moreover, the privilege against self incrimination extends not only to answers that would in themselves support a conviction, but to those that would furnish a link in the chain of evidence needed to prosecute." Id. (internal quotation marks omitted) (quoting Territory of Hawaii v. Lanier, 40 Haw. 65, 72 (Haw. Terr. 1953)). This privilege, however, does not protect against "remote possibilities of future prosecution out of the ordinary course of law, but is confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." Id. (citations, internal quotation marks, and brackets, omitted) (quoting Hoffman v. United States, 341 U.S. 479, 486 (1951)).

> To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim "must be governed as much by his or her personal perception of the peculiarities of the case as by the facts actually in evidence."

Id. (brackets omitted) (quoting Hoffman, 341 U.S. at 486-87).

Evaluating Ortegon's invocation of the privilege against self-incrimination, we hold that the circuit court did not abuse its discretion by not compelling Ortegon to testify on Bruce's behalf. The circuit court was aware of the fact that CW and Stewart were arrested for prostitution and that CW claimed to have worked for Bruce, Ortegon's alleged boyfriend, at one point in time. The circuit court was also aware of the fact that sheriffs were present at the courthouse to arrest Ortegon on an outstanding bench warrant and that Bruce's testimony suggested

---

[18](...continued)
a witness against himself[.]"

that Ortegon was also involved in prostitution. Given the setting in which Ortegon was to testify, there was a reasonable danger that Ortegon's testimony could have resulted in injurious disclosures about her own alleged prostitution activities. Thus, the circuit court's refusal to compel Ortegon to testify was not an abuse of the circuit court's discretion. See Kupihea, 80 Hawai'i at 312, 909 P.2d at 1127.

### IV. CONCLUSION

Therefore, the "Judgment of Conviction and Sentence" entered on May 5, 2015 in the Circuit Court of the First Circuit is vacated and this case is remanded for a new trial consistent with this opinion.

DATED: Honolulu, Hawai'i, October 20, 2016.

On the briefs:

Jon N. Ikenaga
Deputy Public Defender
Office of the Public Defender
for Defendant-Appellant.

Sonja P. McCullen
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee.

Presiding Judge

Associate Judge